1  **Jesse I. Santana (State Bar No. 132803)**
   **Santana and Smith Law Firm, P.C.**
2  The Historic Winship Building
   500 Second Street
3  Yuba City, CA 95991
   TEL: (530) 822-9500
4  FAX: (530) 751-7910
   jesse@santanalaw.net
5
   Attorney for Defendant
6  Jorge Lamas

7
                    **UNITED STATES DISTRICT COURT**
8
                    **EASTERN DISTRICT OF CALIFORNIA**
9

10
   UNITED STATES OF AMERICA,          No. 2:19-CR-192 MCE
11
              Plaintiff,              **DEFENDANT JORGE LAMAS' FURTHER**
12                                     **DECLARATION**
   v.
13
   CHRISTOPHER ROSS,
14 JUAN CARLOS VASQUEZ,
   RAMIRO BRAVO MORALES,
15 and JORGE LAMAS,
                                       Date:  May 27, 2021
16            Defendants.              Time:  10:00 a.m.
                                  /    Hon.:  Morrison C. England
17

18
         I, Jorge Lamas, declare:
19

20
         1.    My attorney Jesse I. Santana and I have prepared this further declaration which Mr.
21
   Santana has interpreted and translated for me in Spanish.  I have personal knowledge of the
22
   matters stated in this further declaration and could competently testify to them if called as a
23
   witness.
24
         2.    On October 25, 2019, I was at my residence at 9735 N Street in Live Oak,
25
   California.  When I was by a white picket fence outside of my residence, law enforcement
26
   officers surrounded me and my house.  There were about four or five marked and unmarked
27

28
                                         1

police vehicles parked in front of my house and on the street in front of my house.  There were about six to eight officers who approached me and my residence.  One of the officers had a police dog with him.

3.      While I walked about five feet away from the white picket fence outside of my residence, several officers drew their guns and pointed them at me.  With their guns drawn and pointed at me, the officers approached me.  The officers yelled at me to "stop" and other words in English that I did not understand.  Immediately, I believed that I was under arrest.  I stopped and put my hands up.  After one of the officers pointed his gun at me with one hand and pointed at the ground in front of me with his other hand, I immediately got down on my knees with my hands still up in the air.  While one officer pointed a gun at me, another officer handcuffed me with my hands behind my back.  The officer searched me and took my personal belongings, including my wallet, keys, and cell phone.  In Spanish, I asked the officer what was going on, but the officer did not respond to my question.  In Spanish, I told the officer that I only spoke Spanish.  It appeared to me that the officer did not speak Spanish.  The officers said words to me in English that I did not understand.  While I was handcuffed with my hands behind my back, one officer pointed a gun at me, and the other officer grabbed my arm and had me stand near an unmarked police vehicle.  Photographs of my arrest are attached as Exhibits A through K.

4.      For about 30 minutes, officers made contact with me before I was transported to Sacramento.  Several officers, including a Spanish-speaking officer, approached and surrounded me as I was either standing near, or sitting in, a police vehicle.  An officer took photographs of me while I was being handcuffed and after I was handcuffed.  The Spanish-speaking officer conversed with the other officers in English and conversed with me in Spanish.  I asked the Spanish-speaking officer why they had me in handcuffs.  In the presence of the other officers with whom he was conversing, the Spanish-speaking officer told me in Spanish that they  had put handcuffs on me for their protection and that they were going to take me to Sacramento where a detective was going to ask me questions.  The Spanish-speaking officer seemed to be translating for the other officers who were standing near me.  I asked the Spanish-speaking

1  officer why I had to go to Sacramento.  The Spanish-speaking officer told me not to worry and

2  that I would be released after I answered the detective's questions in Sacramento.  I asked what

3  I had done or what I was being accused of, and the Spanish-speaking officer told me that I was

4  not being accused of committing a crime and that I was not being charged with a crime because

5  I was a witness to a case that they were investigating.  Again, the Spanish-speaking officer told

6  me that I would be released after I answered the detective's questions.  The Spanish-speaking

7  officer told me not to worry and that one of the officers would drive me back to my residence

8  in Live Oak after I answered the detective's questions in Sacramento.

9          5.        Before we left Live Oak, the officers removed the handcuffs which were on my

10  hands behind my back, and handcuffed my hands in front of me.  The officers also put a chain

11  around my waist and shackles on my legs.  The officers then put me in an unmarked police

12  vehicle.  As we were leaving, I saw about four parked police vehicles and about five officers

13  near my residence.

14          6.        When the officer was driving me to Sacramento, he showed me my cell phone and

15  made a hand gesture like telling me to punch in my pass code to unlock my cell phone.  I

16  punched in my pass code and unlocked my cell phone.  I saw the officer look at some of the

17  contents of my cell phone.

18          7.        The officer drove me to Sacramento.  After we arrived, the detective who later

19  interviewed me and another officer approached the police vehicle that I was in.  The detective

20  who later interviewed me told me in Spanish to get out of the police vehicle.  In Spanish, I asked

21  the detective what was happening.  After I exited the police vehicle, and while I was still

22  handcuffed and shackled, the same detective told me in Spanish, like the Spanish-speaking

23  officer in Live Oak, not to worry, that I was only a witness to a case that they were investigating.

24  He also said that I would not be charged with any crime, and that I would be released after I

25  answered his questions.  The same detective also told me that he or they would drive me back

26  to my residence in Live Oak after I answered his questions.  The same detective and another

27  officer took me by my arms and told me to walk to another police vehicle.  The detective and

28

3

1 | the officer put me in another police vehicle.

2 |      8.    I am not familiar with Sacramento and the surrounding area.  The detective who

3 | later interviewed me and another officer transported me for about 20 to 30 minutes to another

4 | place that I believe is in Sacramento because that is where the Spanish-speaking officer in Live

5 | Oak told me that I would be interviewed.  Once we arrived at the other location, the detective

6 | who later interviewed me and other officers put me in a room.  I was interviewed in Spanish by

7 | the detective for a long time.  There were other officers present throughout the interview.

8 |      9.    As I stated in my original declaration, Mr. Santana has shown me a video and

9 | audio recording of portions of the detective's interview of me on October 25, 2019.  Mr. Santana

10 | has informed me in Spanish that under the Miranda rights, a person has the right to remain silent,

11 | the right to consult with an attorney before and during any questioning, if a person cannot afford

12 | an attorney, one will be appointed to the person free of charge before any questioning, and

13 | anything the person says can be used against him in court.  Towards the beginning of the

14 | interview, the detective attempted to explain to me in Spanish what Mr. Santana has explained

15 | to me are the Miranda rights.  At 23 minutes and 31-34 seconds in the video recording of the

16 | October 25, 2019 interview, the detective states, "Jorge, tienes el derecho de *permanace* [sic or

17 | phonetic] en silencio."  See Exhibit A to Santana Decl. at page 9, lines 12-14; Exhibit B to

18 | FitzGibbon Decl. at page 9, lines 15-17; emphasis added.  I was confused because I had never

19 | heard the word "permanace" and I did not know or understand what the detective was trying to

20 | tell me at 23 minutes and 31-34 seconds in the interview.

21 |      10.    At 23 minutes and 39-44 seconds in the video recording of the October 25, 2019

22 | interview, the detective states, "Tienes el derecho de hablar con un abogado y que esté, esté

23 | presente contigo cuando seas *interragado* [phonetic]."  See Exhibit A to Santana Decl. at page

24 | 9, lines 16-19; Exhibit B to FitzGibbon Decl. at page 9, lines 19-22; italics added.  I did not

25 | understand the word "interragado."  I was thinking that the detective was trying to say,

26 | "enterregado," which means covered in dirt.  However, that did not make sense.  I was confused

27 | because I had never heard the word  "interragado" and I did not know or understand what the

28 |

4

1   detective was trying to tell me at 23 minutes and 39-44 seconds in the interview.

2           11.     At 23 minutes and 45-53 seconds in the video recording of the October 25, 2019

3   interview, the detective states, "Si no tienes la disponibilidad *iconámica* [phonetic] para

4   encontrar a un abogado, uno *seterá* [phonetic] asignado para que te represente antes de un

5   *entegaratorio*." See Exhibit A to Santana Decl. at page 9, lines 19-23; Exhibit B to FitzGibbon

6   Decl. at page 9, lines 22-26; italics added.  I was confused because I had never heard the words

7   "iconámica," "seterá," "asignado," and "entegaratorio" and I did not know or understand what

8   the detective was trying to tell me at 23 minutes and 45-53 seconds in the interview.

9           12.     At 23 minutes and 54 seconds through 24 minutes and 13 seconds in the video

10   recording of the October 25, 2019 interview, the detective states, "Tambien puedes dejar a un

11   lado tu derecho de *permananzar* [phonetic] en silencio y tu derecho de solicitar un abogado y

12   puedo *prodecer* [sic or phonetic] a contestar cualquier pregunta o hacer cualquier comentario

13   que *deses* [sic or phonetic].  Si decides contestar las preguntas, puedes parar en el momento que

14   *deses* [sic or phonetic] y reclamar tu derecho de solicitar a un abogado."  See Exhibit A to

15   Santana Decl. at page 9, line 24-page 10, lines 1-5; Exhibit B to FitzGibbon Decl. at page 9, line

16   26-page 10, lines 1-9; italics added.  I was confused because I had never heard the words

17   "permananzar," "prodecer" and "deses" and I did not know or understand what the detective was

18   trying to tell me at 23 minutes and 54 seconds through 24 minutes and 13 seconds in the

19   interview.

20           13.     Because, other than in the present case, I have had no criminal contact with the

21   police or the legal system, I had never heard of the Miranda rights and I was not familiar with

22   them. When the detective attempted to explain to me what Mr. Santana has informed me are the

23   Miranda rights, I did not understand the words that the detective was using as discussed above,

24   and I did not know or understand what he was telling me.  The detective did not inform me in

25   Spanish or in language that I could understand, what Mr. Santana has informed me are the

26   Miranda rights, that I had the right to remain silent, the right to consult with an attorney prior to

27   and during any questioning, and that, if I could not afford an attorney, one would be appointed

28                                                    5

to me free of charge before any questioning.  At 24 minutes and 15-48 seconds in the recorded interview, I explained to the detective that I did not understand what he was telling me, I asked him what the paper was that he was reading from, I told the detective that he had told me that there were not going to be any problems and that he was not going to charge me with any crime, and that I was not familiar with the legal system.  See Exhibit A to Santana Decl. at page 10, line 6 through page 11, line 10; Exhibit B to FitzGibbon Decl. at page 10, line 12 through page 11, line 18.  At 24 minutes and 48-54 seconds in the video recording of the October 25, 2019 interview, the detective told me that he understood that.  See Exhibit A at page 11, lines 11-12; Exhibit B to FitzGibbon Decl. at page 11, lines 19-20.  At 25 minutes and 13-18 seconds in the recorded interview, I asked the detective to explain to me again what he was trying to tell me. See Exhibit A to Santana Decl. at page 12, lines 1-7; Exhibit B to FitzGibbon Decl. at page 12, lines 10-16.

14.     At 25 minutes and 19-22 seconds in the recorded interview, the detective states, "Okay, Jorge, tienes el derecho de *permanazar* [sic or phonetic] en silencio."  See Exhibit A to Santana Decl. at page 12, lines 8-9; Exhibit B to FitzGibbon Decl. at page 12, lines 17-18; italics added.  Again, I was confused because I had never heard the word "permanazar" and I did not know or understand what the detective was trying to tell me at 25 minutes and 19-22 seconds in the interview.

15.     At 25 minutes and 28-34 seconds in the recorded interview, the detective states, "Okay, Jorge, tienes el derecho de hablar con un abogado y que esté, esté presente contigo cuando seas *interragado* [sic or phonetic]."  See Exhibit A to Santana Decl. at page 12, lines 11-14;  Exhibit B to FitzGibbon Decl. at page 12, lines 21-24; italics added.  I had never heard the word "interragado" and I was thinking that the detective was trying to say, "enterregado," which means covered in dirt.  However, that did not make sense.  I was confused and I did not know or understand what the detective was trying to tell me at 25 minutes and 28-34 seconds in the interview.

16.     At 25 minutes and 35-46 seconds in the recorded interview, the detective states,

1   "Si no tienes la disponibilidad *iconámica* [phonetic] para contratar a un abogado, uno se te será

2   *asiñado* [sic or phonetic] para que te represente antes de un– de algún *interga-intergatorio*. [sic

3   or phonetic]."  See Exhibit A to Santana Decl. at page 12, lines 14-18;  Exhibit B to FitzGibbon

4   Decl. at page 12, lines 23-25-page 13, lines 1-2; italics added.  Again, I was confused because

5   I had never heard the words "*iconámica,*" "*asiñado*" and "*interga-intergatorio,*" and I did not

6   know or understand what the detective was trying to tell me at 25 minutes and 35-46 seconds

7   in the interview.

8          17.     At 25 minutes and 46-59 seconds in the recorded interview, the detective states,

9   "Tambien puedes dejar a un lado tu derecho de *permananzar* [sic or phonetic] en silencio y tu

10  derecho de solicitar un abogado y puede *prodezar* [sic or phonetic] a contestar cualquier

11  pregunta o hacer cualquier comentario que *deses* [sic or phonetic]."  See Exhibit A to Santana

12  Decl. at page 12, lines 19-23; Exhibit B to FitzGibbon Decl. at page 13, lines 3-8; italics added.

13  I was confused because I had never heard the words "permananzar," "prodezar," and "deses*,*"

14  and I did not know or understand what the detective was trying to tell me at 25 minutes and 46-

15  59 seconds in the interview.

16         18.     The detective seemed to quickly read from the document and quickly repeat to me

17  the same thing that he had said before that was confusing and I did not understand.  When the

18  detective attempted for the second time to explain to me what Mr. Santana has informed me are

19  the Miranda rights, I still was confused and did not understand the words that the detective was

20  using and I did not understand what he was telling me.  Again, the detective did not inform me

21  in Spanish or in language that I could understand, what Mr. Santana has informed me are the

22  Miranda rights, that I had the right to remain silent, the right to consult with an attorney prior to

23  and during any questioning, and that, if I could not afford an attorney, one would be appointed

24  to me free of charge before any questioning.  To say the least, I was confused even after the

25  detective's second attempt to explain to me what Mr. Santana has informed me are the Miranda

26  rights.  At 26 minutes and 9-14 seconds in the recorded interview, I told the detective in Spanish

27  that I did not understand him when I said, "You are saying that– like if I go to court or I don't

28

want to talk like, how– if I don't want to, I don't talk or– like how–." See Exhibit A to Santana

Decl. at page 13, lines 2-5; Exhibit B to FitzGibbon Decl. at page 13, lines 14-17.

19.     I was also confused because, before the interview, I was assured several times by

several officers, including the detective who interviewed me, that I was only a witness, that I

would not be charged with a crime, and  that I would be released after I answered the detective's

questions in Sacramento.  Before we left Live Oak, the Spanish-speaking officer told me that

I was not being accused of committing a crime and that I was not being charged with a crime

because I was a witness to a case that they were investigating, and that I would be released after

I answered the detective's questions.  The Spanish-speaking officer in Live Oak also told me not

to worry and that one of the officers would drive me back to my residence in Live Oak after I

answered the detective's questions.  While in Sacramento, the same detective who interviewed

me told me not to worry, that I was only a witness, that I would not be charged with any crime,

and that I would be released after I answered his questions.  The same detective also told me that

he would drive me back to my residence in Live Oak after I answered his questions.  For this

reason, at 26 minutes and 19-24 seconds in the recorded interview, I told the detective in

Spanish, "When I was told that– that you guys were going to let me go, that you were just going

to ask me some questions is all.  That you were gonna let–." See Exhibit A to Santana Decl. at

page 13, lines 13-16; Exhibit B to FitzGibbon Decl. at page 13, lines 24 through page 14, line

2.  Before I could again repeat that I would be let go after answering the detective's questions,

the detective confirmed my understanding based on the earlier assurances and promises from the

officers. At 26 minutes and 24-31 seconds in the recorded interview, the detective immediately

responded, "Of course," and he explained, "And I can't tell you that it's gonna be one or two

questions, but it could be several."  See Exhibit A to Santana Decl. at page 13, lines 17-20;

Exhibit B to FitzGibbon Decl. at page 14, lines 2-6.  At 26 minutes and 31-33 seconds in the

recorded interview, I immediately responded, "Uh-huh," and the detective asked, "Do you

understand me?" and I responded, "Yes, that's fine."  See Exhibit A to Santana Decl. at page 13,

lines 21-23; Exhibit B to FitzGibbon Decl. at page 14, lines 7-12.  At 26 minutes and 33-35

1  seconds in the recorded interview, the detective asked, "Okay.  So, you do understand all that–"

2  and I responded, "Yes."  See Exhibit A to Santana Decl. at page 13, lines 24-26; Exhibit B to

3  FitzGibbon Decl. at page 14, lines 10-12.  Immediately after receiving the detective's

4  confirmation of what he and the Spanish-speaking officer in Live Oak had promised, that I

5  would not be charged with any crime because I was only a witness, and that I would be released

6  after I answered the detective's questions, I proceeded to answer the detective's questions.

7  Later in the interview, the detective continued to tell me in Spanish that I was not involved in

8  the case that they were investigating, and that I was "just a witness."  See Exhibit A to Santana

9  Decl. at page 182, lines 24-26; page 200, lines 23-24; Exhibit B to FitzGibbon Decl. at page 190,

10  lines 17-19; page 209, lines 1-2.  The detective also told me that he would personally drive me

11  back to Live Oak after the interview.  See Exhibit A to Santana Decl. at page 211, line 22-page

12  212, line 7; Exhibit B to FitzGibbon Decl. at page 220, lines 2-17.

13       20.     Despite the fact that I was confused and did not understand some of the words that

14  the detective was using, and I did not understand what he was telling me when he attempted to

15  explain to me what Mr. Santana has informed me are the Miranda rights, I answered the

16  detective's questions only because the detective who interviewed me and the Spanish-speaking

17  officer in Live Oak promised me that I would not be charged with any crime, that I was only a

18  witness to a case that they were investigating, and that I would be released after answering the

19  detective's questions.

20       I declare under penalty of perjury under the laws of the United States of America that the

21  foregoing is true and correct.

22

23  Date:  April 24, 2021.                    /s/ Jorge Lamas
                                              Jorge Lamas
24

25

26

27

28                                         9